# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| GEORGE REYNOLDS EVANS, | ) |
| Plaintiff, | ) |
| v. | ) 1:14CV1091 |
| OFFICER J.K. GRIFFIN, et al., | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

I.

Pro se Plaintiff George Reynolds Evans originally filed this § 1983 action in the Eastern District of North Carolina, alleging that his civil rights were violated when he was unlawfully searched and arrested in Greensboro, North Carolina. That Court dismissed in part Evans' claims as frivolous, but allowed his claims against Officer J.K. Griffin in his individual capacity and those against the City of Greensboro ("the City") to go forward. (Order (Aug. 11, 2014) [Doc. #19].) Thereafter, the action was transferred to this district. (Order (Dec. 30, 2014) [Doc. #41].)

On February 6, 2017, this Court entered an Order on a Second Motion to Dismiss [Doc. #66] filed by Griffin and the City (collectively "Defendants"). [Doc. #74.] The Court determined that, "[b]ased on [his] allegations and the information presented, Plaintiff has not alleged facts to show that Defendant Griffin lacked probable cause" to arrest him. (Order at 6.) However, because the Court considered various items that Evans had submitted, including the police report of

the incident in question (see [Doc. #44-3]), it was determined prudent to give the parties notice of the Court's intent to treat the motion as one for summary judgment and additional time to conduct discovery and submit supplemental briefing and any additional evidence. (Order at 7.) Consideration of the Motion to Dismiss was stayed until supplemental motions had been fully briefed and the matter referred for further consideration by the Court. (Id. at 7-8.)

Since the entry of that Order, Evans and Defendants have filed additional briefing and materials with the Court, including Defendants' Supplemental Summary Judgment Motion [Doc. #81], and the matter has been referred for further consideration.

II.

In early November 2011, Griffin, a police officer with the City of Greensboro Police Department, began surveilling an antique store, Rhyne's Corner Cupboard, located at 603 S. Elm Street, Greensboro, North Carolina. (Decl. of J.K. Griffin ¶¶ 1, 2, 4 (June 7, 2017) [Doc. #81-1].) He was prompted to do so after learning from his sergeant, C.T. Blaylock, that the owner of Rhyne's Corner Cupboard, Dick Rhyne, reported that he had received a suspicious phone call at the store during which the caller stated that he had thirty of some kind of medication to sell. (Id. ¶¶ 2, 3.) This led Rhyne to believe store employees were involved in buying prescription medications. (Id. ¶ 3.)

Griffin conducted surveillance for five days over a two week period for three to five hours at a time. (Id. ¶ 4.) He noticed people who appeared to be between

2

the ages of fifty and sixty arrive at the store with handicapped placards, park their vehicles, and enter the store without hesitation. (Id.) Once inside, they did not look around the store as if to shop, but seemed familiar with the store and acted as though they had specific business there. (Id.) They left the store a few minutes later. (Id.) These activities were consistent with those that Griffin had seen at other locations where illegal narcotics transactions have taken place. (Id.)

On November 22, 2011, Griffin learned from Blaylock that Rhyne had reported a second phone call. (Id. ¶ 5.) The caller told Rhyne that he "had 30 to bring" to the store and described himself as a black male who would be wearing black pants, a blue coat, and a blue toboggan or knitted cap. (Id. ¶ 6.) Griffin believed the "30 to bring" was a reference to selling thirty pills of some kind of medication at the store. (Id. ¶ 7.) Rhyne then contacted Griffin directly and told him that a man who matched the caller's self-description was present outside the store. (Id. ¶ 8.) Griffin arrived at the store and saw a black male standing outside it. (Id. ¶ 9.) According to Griffin, the black male was wearing the clothes the caller had described: black pants, a blue coat, and a blue toboggan or knitted cap. (Id.) Griffin avers that because the black male matched the description that the caller gave of himself, he believed the black male to be the caller. (Id.) The black male outside the store was Evans.

According to Evans, he was across the street from the entrance of Rhyne's Corner Cupboard at this time. (Decl. of George R. Evans ¶ 16 (Apr. 10, 2017)

3

[Doc. #78-1].[1]) He consistently maintains that he was not wearing the clothing that Griffin described. (Id. ¶ 5 ("I did not have on the clothes Griffin described in his report of what the store owner say."), ¶ 16 ("I was not dress [sic] the way Griffin stated[.]"); Decl. of George R. Evans ¶ 5 (June 20, 2017) [Doc. #86] ("I did not have on the described clothing Griffin said in number 6 of Declaration.").)

Once Officer K.M. Pope arrived on the scene, he and Griffin approached Evans, and Griffin asked him what he was doing. (Decl. of Griffin ¶¶ 10, 12.) Evans asked Griffin what was going on, and Griffin explained he had received a phone call that Evans was at the store attempting to sell prescription medication. (Id. ¶ 12.) Griffin asked Evans if he had anything illegal on him, and Evans said no. (Id.) According to Griffin, he then asked Evans whether he had any prescription medications with him, and Evans said he had his own medication with him. (Id.) Griffin then avers that he asked Evans if he could "pat him down" and search his pockets to which Evans responded that he did not want to be searched. (Id. at ¶ 13.) Griffin contends that he then explained to Evans that he was searching Evans with probable cause, after which Evans said that he had four prescription bottles, three in his pants pocket and one in his inner left coat pocket. (Id.)

---

[1] Each of Evans' Declarations cited in this Memorandum Opinion and Order were made pursuant to 28 U.S.C. § 1746 which provides, in relevant part, "Wherever . . . any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration . . . in writing of the person making the same . . ., such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration . . . in writing of such person which is subscribed by him, as true under penalty of perjury, and dated . . . ."

4

Indeed, Griffin found the prescription bottles, one of which had been filled that day with thirty hydrocodone pills, and two cell phones, one of which showed the last number dialed to be Rhyne's. (Id. ¶¶ 14-16.) According to Griffin, he then arrested Evans. (Id. ¶ 18.) He later charged Evans with possession with intent to sell/distribute a Schedule III controlled substance. (Id. ¶ 24.)

Evans presents a different version of events. According to Evans, Griffin asked him if he had any illegal drugs or weapons to which he responded, "no." (Decl. of Evans ¶ 11 [Doc. #86].) When Griffin then asked Evans if he could search him, Evans again said no. (Id.) It is difficult to discern the precise chronology of what happened next according to Evans. After he denied Griffin's request to search, he did allow Griffin to frisk him, (id.; see also Decl. of George K. Evans ¶ 14 (Dec. 30, 2015) [Doc. #60]), but Griffin went beyond a frisk and into his pockets for a full search, (Decl. of Evans ¶ 11 [Doc. #86]; Decl. of George R. Evans ¶ 4 (May 31, 2016) [Doc. #72]), which either happened before his arrest, after his arrest, or both, (see Decl. of Evans ¶ 14 ("I only gave Officer permission to frisk me for weapons for their safety and they decided to handcuff me and search me.") [Doc. #60]; Decl. of Evans ¶ 1 ("Defendant J.K. Griffin immeadiately [sic] placed me under arrest and searched me and took my medication" [Doc. #70-1]). Evans contends that Griffin arrested Evans after he refused to be an informant in the case against the store clerk, (Decl. of Evans ¶¶ 4, 7 [Doc. #60]; Decl. of Evans ¶ 4 [Doc. #70-1]), and it was only during the search after Evans' arrest that Griffin found the medications, (Decl. of Evans ¶ 28 [Doc. #78-1]).

III.

"Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,' Fed. R. Civ. P. 56(a)." Groves v. Commc'n Workers of Am., 815 F.3d 177, 181 (4th Cir. 2016). The moving party bears the initial burden of establishing "the basis for its motion[] and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)[2]). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A dispute is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. Id. at 248. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. Id.

As is relevant here, a plaintiff pursuing an action under 42 U.S.C. § 1983 must show that the state actor violated one of the plaintiff's constitutional rights and such violation occurred under color of state law. See, e.g., Philips v. Pitt Cty.

---

[2] Rule 56(c) was amended effective December 1, 2010, but the substance of the rule did not change.

Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Here, Evans argues that Griffin violated his Fourth Amendment right to be free from unreasonable searches and seizures because Griffin lacked probable cause to search and arrest him. On the other hand, Griffin argues that there is no genuine dispute of material fact, he had probable cause to arrest Griffin, and, if he did not, he nevertheless has qualified immunity from suit. The City had earlier argued in its Motion to Dismiss that not only is there no respondeat superior liability in a § 1983 suit, but Evans had not sufficiently alleged facts to make it plausible that Griffin's purported deprivation of Evans' rights resulted from the City's custom or policy.[3]

IV.

Probable cause to search for purposes of the Fourth Amendment exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." United States v. Kelly, 592 F.3d 586, 591-92 (4th Cir. 2010) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)). Probable cause to arrest exists when the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is

---

[3] While Griffin's and the City's motion for summary judgment is entitled "Defendants' Supplemental Summary Judgment Motion", the City proffers no argument in further support of its earlier challenge as to the sufficiency of the factual allegations against it. However, because neither Evans nor Defendants were required to submit further briefing, the City's earlier arguments are considered to be in continued support of its Supplemental Summary Judgment Motion.

7

about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979); see also Draper v. United States, 358 U.S. 307, 313 (1959) (finding probable cause exists when "the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed") (last alteration in original). A court "examine[s] the events leading up to the arrest, and then decide[s] whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." District of Columbia v. Wesby, ___ U.S. ___, 138 S. Ct. 577, 586 (2018) (international quotations omitted). "It requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." Id. (internal quotations omitted.) In this case, Griffin suspected Evans of possession with intent to sell prescription drugs, (see Decl. of Griffin ¶ 12), and ultimately charged him with possession with intent to sell/distribute a Schedule III controlled substance, (id. ¶ 24). See N.C. Gen. Stat. § 90-95(a)(1) ("Except as authorized by this Article, it is unlawful for any person: (1) To . . . possess with intent to manufacture, sell or deliver, a controlled substance").

Here, a reasonable jury could believe Evans' version of events and find that Griffin lacked probable cause both to search and to arrest Evans. Griffin, in response to a report by Rhyne of a suspicious telephone call suggesting employees were buying prescription medications, surveilled Rhyne's Corner Cupboard in early November and observed behavior consistent with illegal narcotics transactions. On

8

November 22, Rhyne reported a second suspicious telephone call in which the caller, who "had 30 to bring" to the store, described himself as a black male who would be wearing black pants, a blue coat, and a blue toboggan or knitted cap. Rhyne then called Griffin to report that a man matching the caller's description was outside the store.

When Griffin arrived, according to Evans' Declarations, he did not find a black male wearing black pants, a blue coat, and a blue toboggan or knitted cap. Instead, he found a black male who did not otherwise match the description the caller gave of himself. Furthermore, there is no evidence that Griffin recognized Evans as among the individuals he observed enter the store during his fifteen to twenty-five hours of surveillance over the course of two weeks in early November. There is also no evidence that on November 22, when he responded to the store, that he saw Evans do anything, much less take any of the actions that led Griffin to believe the individuals he observed at the store earlier that month were conducting illegal narcotics sales – he did not see Evans arrive by car, or enter the store, or interact with anyone. In fact, it was only "because the black male matched the description the caller gave of himself, [that Griffin] believed the black male to be the caller." Yet, should Evans be believed, he did not match that description.

Nevertheless, Griffin approached him, engaged him, and searched him – either prior to arrest, at which point there was no probable cause for a search, or incident to arrest, which would have been unlawful since there was no probable

9

cause to support an arrest. Either way, there is a genuine dispute of whether the facts and circumstances known to Griffin at the times he searched and arrested Evans would cause a reasonable officer to believe that Evans possessed prescription drugs for the unlawful purpose of selling them to others.

V.

Griffin has asserted qualified immunity from Evans' § 1983 claims. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotations omitted). "An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." Id. at 243-44. The doctrine "balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id. at 231. It "operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotations omitted).

Here, at this summary judgment stage, Griffin is not entitled to qualified immunity. There are genuine disputes of material fact as to the existence of probable cause to search and ultimately arrest Evans. Were a jury to believe Evans, not only was there no probable cause to search or arrest him, but the right

10

to be free from unlawful search and seizure under those circumstances was clearly established in November 2011. See Pearson, 555 U.S. at 243-44 ("An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment."); Graham v. Gagnon, 831 F.3d 176, 182 (4th Cir. 2016) (recognizing the right at issue is "the right to be free from arrest under the particular circumstances of the case" and explaining that "officers lose the shield of qualified immunity if it would have been clear to reasonable officers in their position that they lacked probable cause to arrest [the defendant] for violating [the law]"); Rogers v. Pendleton, 249 F.3d 279, 290 (4th Cir. 2001) ("If a person is arrested when no reasonable officer could believe, in light of the contours of the offense at issue, that probable cause exists to arrest that person, a violation of a clearly established Fourth Amendment right to be arrested only upon probable cause ensues.").

A reasonable officer would have known that there was no probable cause to search a man who does not match the description of a suspect and about whom nothing more has been observed. Furthermore, a reasonable officer would have known that refusing to consent to a search or refusing to participate as an informant does not provide probable cause for an arrest. Therefore, Griffin's motion for summary judgment on the § 1983 claims against him is denied.

VI.

The City has also moved to dismiss Evans' claims against it. In response, Evans avers that the City knew Griffin operated outside of the law, (see, e.g.,

11

Decl. of Evans ¶ 10 [Doc. #70-1]), the City failed to adequately monitor, screen, train, and supervise officers, (see, e.g., Decl. of George K. Evans ¶ 1 [Doc. #71]), IAD and Police Professional Standards failed to take Evans' written report or investigate the charge he was trying to file against Griffin, (see, e.g., id. ¶ 2), and the City has a history of negativity when it comes to race such as the Woolworth sit-in, integration, and the "killing of the Communist worker party by KKK who was able to get past what was suppose[d] to be Greensboro Police Department security", (see, e.g., id.). Evans also filed a New York Times article from October 24, 2015, entitled "The Disproportionate Risks of Driving While Black" which "examin[ed] . . . traffic stops and arrests in Greensboro, N.C." and "uncovered wide racial differences in measure after measure of police conduct." (See Sharon LaFraniere & Andrew W. Lehren, The Disproportionate Risks of Driving While Black, N.Y. Times, Oct. 24, 2015, at A1 [Doc. #69].) He also attached an undated four-paragraph article entitled "Greensboro police end stops for minor traffic cases" from an unknown source. (See Article [Doc. #62-1].)

To the extent that Evans argues the City is liable for Griffin's unconstitutional acts simply as his employer, "a municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978). Instead, "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989) (citing Monell, 436 U.S. at 694-95). More specifically, "[i]t is only when the execution of the

government's policy or custom . . . inflicts the injury that the municipality may be held liable under § 1983." Id. (internal quotations omitted).

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'

Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999)).

A plaintiff claiming that a city is liable under § 1983 for its failure to screen potential employees must show the city's "deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the [city's] decision". Bd. of Cty. Cmm'rs of Bryan Cty., Okla. v. Brown, 520 U.S. 397, 411 (1997). Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. at 410.

> Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequences of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference.'

Id. at 411. Culpability "depend[s] on a finding that <u>this</u> officer was highly likely to inflict the <u>particular</u> injury suffered by the plaintiff." Id. at 412. There is no

13

evidence whatsoever to support Evans' claim against the City for its failure to screen.

When a plaintiff alleges inadequate police training, he must show that "the failure to train amounts to deliberate indifference to the rights of the persons with whom the police come into contact." Canton, 489 U.S. at 388. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality – a 'policy' as defined by . . . prior cases – can a city be liable for such a failure under § 1983." Id. at 389. For example, "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. at 390. If this failure "actually causes injury", "the city may be held liable". Id.

To determine if a city is liable for a failure to train, "the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform" and the alleged "deficiency in a city's training program must be closely related to the ultimate injury." Id. at 390, 391. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." Id. at 390-91. However, a failure to train could exist where a municipality has failed "to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face"

or "where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations involving the exercise of police discretion." Id. at 396-97 (O'Connor, J., concurring in part and dissenting in part). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick v. Thompson, 563 U.S. 51, 62 (2011). There is no evidence whatsoever of the City's training of its officers, that it failed to train officers about recognizing probable cause to search or to arrest, that the City was aware of and acquiesced in a pattern of warrantless searches and seizures lacking probable cause, or that there was a pattern of similar unconstitutional violations by untrained officers.

It is unclear whether the law recognizes municipal liability under § 1983 for a failure to supervise. Compare Moody v. City of Newport News, Va., 93 F. Supp. 3d 516, 540-42 (E.D. Va. 2015) (stating "[a]s an initial matter" that "is it not clear that the Fourth Circuit has established that supervisory liability principles apply to municipalities", applying Shaw v. Stroud, 13 F.3d 791 (4th Cir. 1994), nevertheless, and finding that the plaintiff failed to allege sufficient facts in support of his claim) with Weigle v. Pifer, 139 F. Supp. 3d 760, 792-94 (S.D.W. Va. 2015) (applying Shaw without question and finding that, because the facts did not satisfy the first prong of supervisory liability, "the City is entitled to summary judgment on the Monell claim predicated on its failure to supervise").

The Fourth Circuit Court of Appeals does recognize that supervisory officials may be liable under § 1983, because "that liability is not premised upon

respondeat superior but upon 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Shaw, 13 F.3d at 798 (quoting Slakan v. Porter, 737 F.2d 368, 372-73 (4th Cir. 1984)). To show supervisory liability under § 1983, a plaintiff must provide evidence

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'[]; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Id. at 799. Even if a claim for municipal liability for its failure to supervise is recognized under § 1983, there is no evidence to support Evans' claim here.

A plaintiff alleging a failure to investigate his report of an unlawful search and seizure must "show that [the city] had failed to investigate previous incidents before a court could conclude the [officer] at the time [of the incident] believed a municipal custom allowed [him] to violate [the plaintiff's] rights with impunity." Mettler v. Whitledge, 165 F.3d 1197, 1205 (8th Cir. 1999) cited in Moody, 93 F. Supp. 3d at 535. A failure to investigate the unconstitutional conduct against the plaintiff "might serve as grist should another [unlawful search and seizure] claim arise in the future", but "it could not have resulted in the constitutional deprivation [the plaintiff] alleges – the antecedent [unlawful search and seizure] – and consequently is not actionable under § 1983." Lavender v. Roanoke Sheriff's

Office, 826 F. Supp. 2d 928, 935 (W.D. Va. 2011). Such is the case here. The only evidence of the City's failure to investigate is Evans' averment that IAD refused to take his complaint or investigate it. There is no evidence that the City had previously failed to investigate other incidents such that Griffin would have believed a City policy allowed him to search and seize Evans without probable cause. Therefore, summary judgment in favor of the City of Greensboro on all claims against it is granted.

### VII.

For the reasons explained herein, IT IS HEREBY ORDERED that Defendants' Second Motion to Dismiss [Doc. #66] is DENIED AS MOOT and that Defendants' Supplemental Summary Judgment Motion [Doc. #81] is GRANTED IN PART AND DENIED IN PART. It is GRANTED IN PART as to all claims against the City of Greensboro. It is DENIED IN PART as to all claims against Officer J.K. Griffin in his individual capacity.

IT IS FURTHER ORDERED that this matter be scheduled in accordance with Local Rule 16.1, a copy of which shall be mailed by the Clerk to Plaintiff George Evans, along with a copy of this Memorandum Opinion and Order.

This the 28th day of March, 2018.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge